There were but two other witnesses who testified in the case; Mr. Eminger, on the part of complainants, and Mr. Robinson, on the part of defendants. Each of these witnesses testifies, that he was present and heard all that transpired between the parties; and the testimony of each is almost, if not quite, as directly in conflict with that of the other, as the testimony of the parties to the suit. The testimony of Robinson is, however, much the more pointed, specific, and satisfactory.

Eminger testifies upon the main point in controversy, as follows: "For the balance, a note was to be given, payable January 1, 1867, providing Mr. Reilly sustained his claims before a competent court. Afterwards, but before the contract was signed, he repeatedly asserted that the Messrs. Hoover should not pay said note unless his claim was sustained by the court." "After the papers were signed, Mr. Reilly again said, that the Messrs. Hoover should have no uneasiness concerning the last note, that he would never ask them to pay a dollar on it unless his claim should be sustained in court." And in a conversation witness had with Reilly after the contract was signed, he said, "You see I don't want anything but what is fair from the Messrs. Hoover, and that unless I make my claims good, I shall never ask them to pay a cent on the note." Thus far we are left entirely to inference, as to whether an adjudication was to be brought about by a suit to be instituted by one party or the other, and if so, by which party; or, whether it was left contingent upon a suit to be commenced by some other party. But inference is not sufficient ground upon which to do away with or reform a written agreement. As we have seen, the proof must be clear and positive. But this witness gives us a little more light upon the subject. He says, "Mr. Reilly did say that he wanted money to prosecute parties who were infringing upon his patent, meaning Mr. Seiberling, and that he would immediately, as soon as he got matters arranged at home, notify the parties, and if they did not agree to pay him royalty, he was to prosecute them in the highest courts, and thereby test the validity of his patent. It was also the understanding, that the contemplated suits should be or were a part of the contract, and that unless he made his claim valid, he would never ask the Messrs. Hoover to pay the last note of $2,500."

What "contemplated suits" are here referred to? Of course, those mentioned just before, that is, suits to be commenced by Reilly, in the contingency that parties infringing his patent, on being notified, did not agree to pay him royalty. As to what was to be done in regard to commencing suits in case such parties did agree to pay him a royalty, we are left entirely in the dark. The only inference we can draw from this testimony is, that if parties so infringing did agree to pay royalty, then no suits were

to be commenced. And this is really the common sense of the thing after all. Let this be inserted in the contract just as testified to by this witness, in lieu of the provision as it now stands, and it would make no material change in the legal effect of the agreement as a whole.

The testimony of Robinson is much more explicit and satisfactory, and it contradicts Eminger in every important particular; and as he stands before the court on an equal footing with Eminger, as to credibility, his testimony at least neutralizes that of Eminger; and it may be further said, that, being in conformity with the written agreement, it is for that reason of greater weight than that of Eminger, which is in opposition to it.

The proofs therefore, do not bring the case within the rule of law above stated, under which relief may be granted in such cases, and for that reason, as well as for the reason before stated, that the bill does not state such a case as equity will relieve against, the bill must be dismissed, with costs to the defendants. Let a decree be entered accordingly.

HOOVER (WELCH v.). See Case No. 17,-368.

HOOVER (YOUNG v.). See Case No. 18,158.

## Case No. 6,678.

### The HOPE.

[2 Gall. 48.] [1]

Circuit Court, D. Massachusetts. May Term, 1814.

CUSTOMS DUTIES — FORFEITURE — KNOWLEDGE OF MASTER—NON-IMPORTATION ACT.

1. The master of a ship is not a competent witness in an information in rem for a forfeiture occasioned by his misconduct. See Dunl. Adm. Prac. p. 248, c. 10.
   [Cited in The Boston, Case No. 1,673; The Nymph, Id. 10,389; McKinney v. Neil, Id. 8,865; The Peytona, Id. 11,058; Patten v. Darling, Id. 10,812.]
2. Circumstances of presumption of master's knowledge of illegal goods being on board.

[Appeal from the district court of the United States for the district of Massachusetts.

[This was a libel by the United States against the schooner Hope (Ritchie and Carson, claimants), for having imported and concealed on board goods of British manufacture, contrary to the existing nonimportation laws. The district court entered a decree in favor of the claimants, and the United States appealed.]

G. Blake, for the United States.
E. Rockwood, for claimants.

STORY, Circuit Justice. The schooner Hope has been seized, as forfeited for a violation of the sixth section of the non-importa-

[1] [Reported by John Gallison, Esq.]

tion act of March 1, 1809, c. 91 [2 Story's Laws, 1114; 2 Stat. 528, c. 24]. From the evidence it appears, that in the latter part of the year 1812, the schooner was captured on a voyage to Spain, carried into England for adjudication, and there finally restored. She afterwards sailed from England, apparently without any cargo, having passengers on board, who had been prisoners of war, and arrived at Boston in August, 1813. On her arrival, she was reported as in ballast, and her manifest contained no statement of any British merchandise being on board. On search, however, in the cabin, under the berths of the master and mate, divers goods of British manufacture were found concealed, which were seized, and, no claim having been interposed therefor, the same have since been condemned and sold for about $1890. At the time of the seizure some of these goods were claimed by the master as his own property and some as the property of the mate and passengers. The goods claimed by the master were found in the same places, where the others were concealed, and the rule must apply, noscitur a sociis. It is an almost necessary presumption, that the master knew, where his own goods were; and if so, it is extremely difficult to suppose him ignorant of the concealment of the other packages. It was his duty to exercise every diligence in order to avoid involving the ship in the severe penalties imposed by law upon illegal importations. If these goods had been concealed in unusual places, to which the master might not be supposed to have had ordinary access, there might be some color for asserting his ignorance of the contents of the other packages. But here the very goods claimed by himself have been abandoned on account of their illegal character, and the other packages must, in a mind not wilfully blind, have attracted the strongest suspicions. The master had a right to know their contents, and being put upon inquiry by circumstances calling loudly for it, I must presume that he had full knowledge of the illegal character of the packages, and meant to take upon himself the peril of detection.

I regret, that I cannot see this case in the same favorable light, as the district court. The owners of the schooner do not appear to have had the slightest connexion with this illegal traffic: and it is unpleasant to visit upon them the penal consequences of acts, in which they took no part. But I cannot bend the rules of law to cases of individual hardship. My duty leads me through a harsh and narrow path; but I have the consolation to know, that another avenue is open to a department, which has the power to temper the severity of the law, and yield relief to innocent sufferers. It has been intimated, that if the court should be of opinion, that the master is a competent witness, and would indulge the parties with an opportunity, his testimony could be procured, to prove his ignorance of the illegal merchandize being on board. But even if competent. I cannot say, that the naked denial of the master, standing (as it should seem) in vinculis, could outweigh the other strong circumstances of the case. How could the master be believed, if he should deny his knowledge of his own adventure? I am, however, of opinion that in this case the master is not a competent witness. He is called to exempt the ship from a forfeiture, occasioned by his own illegal conduct. He has therefore a direct interest in the event of the suit; and the decree of condemnation would be good evidence in a suit brought against him by his owners. The better opinion in the authorities, in my judgment, supports this doctrine. Fuller v. Jackson, Bunb. 139; Spong v. Fasting, Id. 203. Vide, also, Green v. New River Co., 4 Term R. 589; Bird v. Thompson, 1 Esp. 339; Rickson v. Sandforth, Bunb. 139, note; Taylor v. McViccar, 6 Esp. 27. I reverse the decree of the district court, and adjudge the schooner Hope and appurtenances to remain forfeited to the United States.

HOPE (COLLINGS v.). See Case No. 3,003.

## Case No. 6,679.

### HOPE et al. v. The DIDO.

[2 Paine, 243; 2 Hunt, Mer. Mag. 169.] [1]

Circuit Court, S. D. New York. Dec., 1840.

SALVAGE—WHAT CONSTITUTES—PILOTS—PILOT GROUND.

1. Whether the towing into port of a vessel exposed to the perils of the sea without a rudder, can be considered a salvage service, will depend upon whether, by the loss of her rudder, she was rendered innavigable.
[Cited in The Alaska, 23 Fed. 603, 605.]

2. Pilots may become salvors; but they must first strictly discharge their duty as pilots; and the circumstances under which they may claim to be considered as salvors, must be such as require efforts, perils to be encountered, labor or skill, out of the line of their duty. If, in such case, they act under an agreement for extra compensation, they are thereby precluded from claiming as for salvage service. Where, however, there has been extraordinary personal merit or effort, or unforeseen exertion and hazard in the performance of the service, they are not absolutely concluded by such agreement; but a court of admiralty may, in its discretion, grant them an extra allowance.
[Applied in The Warren, Case No. 17,193. Cited in Flanders v. Tripp, Id. 4,854; The Alaska, 23 Fed. 603. Approved in The Cachemire, 38 Fed. 523.]

3. The limits of pilot ground are not fixed by any rule of law, but depend upon usage or custom; and that usage is not settled and uniform, but varies according to circumstances.

This was a case in admiralty [by Edward Hope and others against the brig Dido and her cargo], tried before the district court, in which a decree was made in favor of the claimants [case unreported], and came up on

[1] [Reported by Elijah Paine, Jr., Esq. 2 Hunt, Mer. Mag. 169, contains only a partial report.]